1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  JONATHAN MICHAEL HARRIS,                    1:10-cv-00914-AWI-DLB (HC)

10                    Petitioner,              FINDINGS AND RECOMMENDATION
                                               REGARDING PETITION FOR WRIT OF
11         v.                                  HABEAS CORPUS

12                                             [Doc. 1]
   JAMES A. YATES,
13
                    Respondent.
14  _____/

15

16         Petitioner is a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus

17  pursuant to 28 U.S.C. § 2254.

                              BACKGROUND[1]
18
           Following a jury trial in the Stanislaus County Superior Court, Petitioner was convicted
19
    of attempted premeditated murder (Cal. Penal Code §§ 664(f)/187)[2]; being a felon in possession
20
    of a firearm (§ 12021(a)); and possession of a short-barreled shotgun (§ 12020), with further
21
    findings that he committed the murder while personally using a firearm (§§ 12022.5(a) &
22
    12022.53(b)) and had a prior serious felony conviction (§ 667).  Petitioner is serving an aggregate
23
    term of twenty-nine years to life.
24
           Petitioner filed a timely notice of appeal.  The California Court of Appeal, Fifth Appellate
25
    District affirmed the judgment on February 26, 2009.
26

27         ──────────────
           [1] This information is derived from the state court documents lodged by Respondent on
28
           [2] All further statutory references are to the California Penal Code unless otherwise indicated.

                                               1

Petitioner then filed a Petition for Review in the California Supreme Court, which was denied on May 20, 2009.

Petitioner filed the instant federal Petition for Writ of Habeas Corpus on May 21, 2010. Respondent filed an answer to the petition on July 28, 2010.  Petitioner did not file a traverse.

STATEMENT OF FACTS[3]

On February 18, 2005, Erskine Woodson was living at the El Capitan Motel in Modesto. On this day his girlfriend, Cheryl Wells (Wells), and another friend, Elizabeth Martinez, were present in the room. The daughter of Wells, Kimberly Wells (Kimberly), is the mother of defendant's child.

At approximately 4 p.m. there was a knock on the door of Woodson's motel room. Defendant was at the door.[FN1] Woodson and defendant walked outside. After having a conversation, defendant turned his back to Woodson then turned back around holding a sawed-off shotgun. The two tussled, and Woodson ran back into the motel room. Defendant followed Woodson into the room. Woodson jumped on a chair. He heard a click sound. Woodson threw a lamp at defendant and ran from the room.

FN1. At trial, Woodson testified the man at his door was not defendant. Our summary of the evidence places the facts in the light most favorable to the prosecution, and the evidence clearly points to defendant as the person who went to Woodson's motel room on February 18, 2005.

The manager of the motel, Andy Yan, heard a noise and ran outside to see what was going on. Woodson was running and shouted to Yan to call the police because defendant was trying to shoot him. Yan saw a white male dressed in dark clothing point something at Woodson and then Yan heard a click. Yan retreated inside and called police.

Keith Terry was parked across the street from the motel when he heard a loud crash. Terry saw a white male backing out of a motel room with a gun in his hands. The gun looked like a sawed-off shotgun. Defendant pointed the gun at Woodson and pulled the trigger. Terry heard a click. Defendant pulled the trigger a second and a third time while following Woodson.

Terry saw defendant walk toward the canal bank. He did not get a good look at defendant's face, but he was able to describe the clothes he was wearing.

Police Officer Alfredo Ibarra detained defendant because he was running by the canal and matched the general description of the man who had attempted to shoot Woodson. Defendant was less than one-half mile from the motel when he was detained. The canal bank was searched and officers found a sawed-off, single-shot shotgun pushed under some grass. Defendant was detained 192 yards from where the shotgun was found. The shotgun's stock was wrapped in a bandana and the gun was loaded.

---

[3] This statement of facts is taken from the Court of Appeal's February 26, 2009 decision attached to Respondent's answer.

Officer John Carrico went to the motel and interviewed Woodson approximately 20 minutes after the incident. Woodson told Carrico that after defendant knocked on the door, the two went outside and talked. Defendant accused Woodson of some things and then defendant turned around. When defendant turned back around he was holding a sawed-off shotgun. Defendant pointed the gun at Woodson's chest and made a derogatory remark. Woodson heard a click sound and ran back into his room, slamming the door behind him. Defendant kicked in the door, and Woodson again heard the click sound. Woodson picked up a lamp, threw it at defendant, and then ran from the room. During the incident Woodson saw defendant open the gun and load it. Woodson described the gun to Carrico when he was interviewed at the motel right after the incident and identified the gun that was found at the canal as the shotgun used by defendant. Woodson was 100 percent sure it was the same gun.

Officer Carrico testified that Woodson identified his assailant as "Jon." Woodson was transported for an in-field show-up of defendant. When Woodson saw defendant, he told Carrico, "That's the one." Woodson was yelling at defendant during the show-up, asking him why he did that to him.

The man who saw the incident from across the street, Terry, identified defendant at an in-field show-up. His identification was not based on defendant's face, but Terry said defendant was wearing the exact clothes and had the same haircut as the man he saw backing out of the motel room with a gun. In addition, defendant was the same race, height, and weight as the man Terry saw.

While being booked at the jail, the officers were discussing how high defendant's bail would be if he actually shot someone. Defendant was not part of this conversation but he stated, "The gun would not fire." During his questioning at the jail, defendant first stated that he was walking down the street by the motel when Woodson waved to him; he then walked down the canal bank and was stopped by police. Upon further inquiry defendant said he went to the motel to speak to Woodson, a pimp, because Woodson had allegedly raped defendant's girlfriend, Kimberly. While speaking to Woodson, defendant claimed Woodson took a swing at him. Defendant denied pointing a gun at Woodson.

Elizabeth Martinez was in the motel room when defendant knocked on the door. She saw a man with a hooded sweatshirt. During the encounter she saw part of the gun when Woodson was on top of the chair. It seemed like Woodson's girlfriend, Wells, knew the gunman. Martinez was taken to the in-field show-up of defendant. She identified defendant as looking like the individual who was in the motel room with a gun. She identified the back of the sweatshirt defendant was wearing as the same sweatshirt worn by the person in the motel room and also said he had on the same pants. She said that defendant was of similar height and weight as the person in the room.

Wells testified under a grant of use immunity. She had known defendant for three years, as he is her daughter Kimberly's boyfriend. Wells was Woodson's girlfriend and was in bed in his motel room when there was a knock on the door. The man at the door was wearing a hooded sweatshirt and pointed a gun at Woodson. She testified that the gun found at the canal was not the gun used by the man in the room. Two or three weeks before the incident, Wells had a talk with defendant. Defendant informed her that Kimberly told him that Wells had turned Kimberly out on the street to be a prostitute and that Woodson had raped Kimberly. Wells told defendant that none of what he had been told was true.

3

In an interview with police prior to trial, Wells identified defendant as the man who entered the motel room and tried to shoot Woodson.

Woodson did not want to testify at trial and during his testimony vehemently stated over and over that defendant was not the person who tried to shoot him. Before trial, Woodson told Cindy Ramsey, a clerk at a motel where Woodson was staying, that it was his girlfriend's daughter's husband who tried to shoot him. Woodson told Ramsey that he was going to lie and say they had the wrong person because he was afraid for his safety. In addition, Woodson was mad at the police for treating him poorly. Ramsey testified that Woodson said he was afraid of defendant's father and had gotten a telephone call from him saying he was going to beat him up.

The shotgun was examined by firearm experts. It had been used so many times that part of it was worn and it would not properly fire every time, although it still could be fired. When the trigger was pulled and the gun did not fire, the sound emitted from the gun was a click sound.

## Defense

Defendant's father, Timothy Harris (Timothy), testified that he met Woodson after the incident. He had never threatened Woodson. Woodson had contacted him for help in getting a motel room and they had smoked together during breaks in the current trial. Timothy thought that defendant did not seem quite right a day or two prior to his arrest and defendant had said he was going to turn himself in to the Stanislaus Behavioral Health Center.

Woodson testified for the defense that he met Timothy at the Christian Brotherhood biker church. After the incident that gave rise to this trial, he called Timothy and asked him for help in moving away from Modesto. There were never any threats by Timothy to Woodson and the two hung out together during the current trial. In addition, Woodson testified that police had treated him unfairly prior to trial when they arrested him while serving him with a subpoena.

Wells maintained she had no idea who the assailant was in the motel room and that she was very intimidated by the officer who interviewed her. An investigator for the defense stated that when he interviewed Wells she said she could not see the face of the person who attempted to shoot Woodson.

## DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Stanislaus County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (*per curiam*).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.   Juror Misconduct

Petitioner's sole claim is that the state courts violated his right to a trial by an impartial jury by finding there was no prejudicial juror misconduct.

1.   Last Reasoned State Court Decision

In the last reasoned state court decision, the appellate court found the claim to be without merit and provided a thorough statement of the procedural background, stating:

> Following the verdict at defendant's trial, it was discovered that the boyfriend of juror No. 10 (# 10) attended much of the trial and had spoken to witnesses and defense counsel during the trial. The court granted the motion to disclose personal identifying information regarding # 10. Over the course of the next two years, information was gathered, and the motion for new trial was denied on September 21, 2007. In reaching its decision, the court relied on declarations of those involved; transcripts of statements given to investigators, which the parties stipulated would be treated as sworn testimony; sworn testimony of # 10 in the court's chambers; and sworn testimony of the boyfriend, Allen Jackson (Jackson), taken at the hearing.
>
> # 10 testified that Jackson came and sat in on two or three days of trial. At the time of trial, they were living together and had been together several years. # 10 told Jackson she could not speak to him about the case and she did not. One day during trial when # 10 and Jackson were walking home together, Jackson told her

6

he did not think defendant was guilty. Jackson did tell # 10 he recognized Timothy, and he thought Timothy was a Hell's Angel. When asked if she disclosed any of this information to the other jurors, # 10 said she had not. The transcript of the interview of # 10 contains statements consistent with her testimony before the court.

Defendant's trial counsel filed a declaration. He stated that Jackson approached him and asked him about the case during the trial. Jackson identified himself to counsel as a friend of defendant's, but when counsel asked defendant if he knew Jackson he said he did not. Defense counsel saw Jackson sitting in the courtroom during the trial and also saw him conversing with Timothy and Woodson.

The court also considered the declaration of Timothy, defendant's father, in determining the motion for new trial. Timothy declared that he was required to wait outside the courtroom during the trial because he was a witness. While waiting outside, Jackson talked to Timothy and solicited information about the case and Timothy's opinion on defendant's guilt. Jackson was seen talking to Woodson during the trial. Jackson told Timothy that his "old lady" was on the jury and he came to watch after she told him it was the Harris case. Timothy learned during his conversation with Jackson that Jackson is related to the Fore family and Timothy said that the Fore family is associated with a motorcycle gang that has a grievance against the Harris family. Timothy declared he had received threats after the trial. Timothy stated that Jackson told him he had played golf with the foreperson.

Jackson testified at the hearing. The first two days of trial, Jackson stayed home and # 10 told him nothing about the trial. He came to court on the third or fourth day of trial, but not with # 10, although # 10 told him what department she was in. Jackson knew Timothy. Jackson acknowledged that he had spoken to defense counsel. In addition, Jackson said he talked to Timothy during breaks and it was possible he told Timothy he was in a position to influence the outcome of the trial and that his wife was on the jury. Jackson testified he was using methamphetamine heavily during trial and that he tried to buy methamphetamine from Timothy during trial but his attempt was not successful. He learned that Timothy was involved in the Hell's Angels and established that Timothy knew his cousin, Rick Fore.

It was confirmed by Jackson that # 10 would not talk to him about the case, but he did tell # 10 that he thought defendant was not guilty. He also told # 10 that he talked to Timothy. # 10 told Jackson she would not talk to him about the case. Jackson's interview was similar to his testimony at the hearing.

In ruling on the motion, the trial court made the following credibility determinations: "One of the things that was, of course, the biggest challenge in this case are the statements that were provided by Mr. Tim Harris as to the strange contact that he had with Mr. Jackson. I can't describe it in any way other than that.

"When I evaluated this, I have no criticism at all of how Mr. Harris described this. I think he was entirely credible in what he said about what Allen Jackson said to him. So everybody should understand, there's no way in which I don't-that I doubt the statements of Mr. Tim Harris that Mr. Allen Jackson said these things to him out in the hallway, including the very strange comments about, I just played golf with the jury foreman; that my girlfriend is on the jury, and this case, don't worry about it. He's going to be found innocent. He also approached Mr. Tim Harris and

said, where can I get a quarter pound of methamphetamine. All of those statements that Mr. Tim Harris related to the investigator, I believe, are true. And I believe actually all the statements that (Juror 10) said are true.

"My evaluation of Mr. Allen Jackson is that he does not have much credibility. And he is the fellow who was trying to interject himself into this case by whatever he was trying to do as a courtroom observer, by whatever contact he was trying to make with Mr. Baker [defense counsel], with Mr. Tim Harris, with anybody he could find out in the hallway. But I think it was actually most enlightening, because when he testified here, one of the things that he acknowledged at this point was in fact, that he was doing methamphetamine and addicted to methamphetamine during the entire time of this trial. And there was a part of that which, when I went back and I re-read everything, made me start to realize that my own evaluation of that testimony is that Mr. Allen Jackson wanted to get some meth and he thought the best way of getting that was going to possibly be if Mr. Tim Harris could somehow help him do that, which Mr. Tim Harris denied and said he didn't do and wouldn't do. So I believe Mr. Tim Harris.

"But I think the person who's the methamphetamine addict wanted to do whatever he could do to get some drugs and say whatever he could to the people out in the hallway, and whatever promises he could make, however absurd or false or otherwise they were, that he tried to do that.

"The record with (Juror 10) is that she's a person who's never been in trouble. And I haven't received any information to the contrary. She told Mr. Jackson that she wouldn't talk about the case, and she didn't talk about the case."

The court found that the extraneous information about Timothy was not inherently prejudicial. The court went on to find that the People met their burden to show that it was not substantially likely that # 10 was actually biased.

### Discussion

Defendant argues that the presumption of prejudice that arose from juror misconduct in this case was not rebutted and therefore reversal is required. He contends the most damaging extraneous information received by # 10 was that Timothy, defendant's father and a witness, was a member of Hell's Angels. Defendant claims that Hell's Angels are viewed with distaste and therefore this information was likely to cause # 10 to discredit Timothy as a witness and make # 10 suspect that his son, defendant, was also involved in a gang. In addition, defendant claims this evidence was likely to cause # 10 to think that Woodson did not identify defendant at trial because Woodson was intimidated by the Hell's Angels. The information # 10 received from Jackson, that Jackson thought defendant was not guilty, is asserted by defendant to be prejudicial because it may have caused # 10 to be resentful of Jackson's attempt to usurp her function as a juror. As an additional argument, defendant contends that the receipt by # 10 of extraneous information about the case deprived him of his right to an impartial jury, a fair trial, and due process of law.

A juror who consciously receives outside information regarding the case commits misconduct. (*People v. Hamilton* (1999) 20 Cal.4th 273, 294.) We reject the People's reliance on *People v. Danks* (2004) 32 Cal.4th 269 in claiming that "arguably" # 10 did not commit misconduct because she did not say anything to Jackson about the case. In *Danks,* a juror discussed with her husband the stress she was feeling in making her decision regarding the death penalty and in

completing her household duties every evening after a full day in court. (*Id.* at pp. 300-304.) The Supreme Court found this was not misconduct because the juror discussed only the stress she was feeling and did not discuss the case or deliberations with her husband. (*Id.* at p. 304.)

The discussion between the juror and her husband in *Danks* did not involve any exchange of information pertinent to the trial. While # 10 did not discuss the case with Jackson, she received outside information about the case from Jackson. After receiving the information, she failed to inform the court. This was misconduct.

"On appeal, the determination whether jury misconduct was prejudicial presents a mixed question of law and fact 'subject to an appellate court's independent determination.' [Citation.] We accept the trial court's factual findings and credibility determinations if supported by substantial evidence. [Citation.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 192.)

"Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. [Citations.]' " (*People v.. Wilson* (2008) 44 Cal.4th 758, 829.)

"The verdict will only be set aside if there appears to be a substantial likelihood of juror bias. [Citation.] Such bias can be inherent or circumstantial. As to inherent bias, we consider whether the '"extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror."' [Citations.] We review 'the trial record to determine the prejudicial effect of the extraneous information.' [Citation.] 'Even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test, the nature of the misconduct and the "totality of the circumstances" surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose.' [Citation.] Under this test, '[a]ll pertinent portions of the entire record, including the trial record, must be considered.' [Citations.]" (*People v. Loker* (2008) 44 Cal.4th 691, 747.) "'[A] finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment.' [Citation.] Moreover, we do not reverse unanimous verdicts because there is *some* possibility the juror was improperly influenced. Rather, the likelihood of bias under the inherent prejudice test 'must be *substantial*.' [Citation.] 'Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.' [Citation.]" (*People v. Danks, supra,* 32 Cal.4th at p. 305.)

We will assume for the sake of argument that evidence regarding the Hell's Angels is gang-related evidence. In the context of evidence admitted at trial, "[e]rroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

Jackson told # 10 he thought defendant's father was a Hell's Angel. A review of the entire record demonstrates that this evidence was not inherently prejudicial. First, Jackson did not tell # 10 that Harris, defendant's father, *was* a Hell's Angel; he told her he *thought* he was and defendant's father was not a percipient witness. Second, there was no extraneous information conveyed to # 10 about the criminal

activities of the Hell's Angels, and evidence regarding the father did not impute culpability to defendant. The mere singular mention of a gang in relation to a peripheral witness and/or relative of the defendant is not such as to invoke an inherent bias.

The fact that Jackson told # 10 he thought defendant was not guilty was also not inherently prejudicial. Although defendant attempts to conjure up a scenario where # 10 was resentful of Jackson attempting to usurp her function, this conjecture is pure speculation and not supported by anything in the record. This is not a case where someone unknown to a juror attempts to influence or frighten a juror by telling her the defendant is not guilty. # 10 and Jackson were in a long-term relationship and nothing in the record suggests # 10 would act out of resentment because her long-term boyfriend voiced an opinion to her. It is not objectively reasonable to believe that simply being told by one's companion that a defendant is not guilty is inherently and substantially likely to influence a juror to be biased to the contrary. Under these circumstances, if a bias can be said to be inherent, it would be a bias in favor of the defendant. The misconduct was not inherently prejudicial.

Finding no inherent bias, we turn to the second part of the test to determine whether a substantial likelihood of actual bias nonetheless arose. After examining the nature of the misconduct and the surrounding circumstances, it is not substantially likely # 10 was actually biased against defendant. Objectively considering the information Jackson told # 10 in light of the overwhelming evidence in this case, the information was not substantially likely to bias # 10.

Although Woodson adamantly testified at trial defendant was not the person who attempted to murder him, the identification of defendant as the man who went to the motel and attempted to shoot Woodson was overwhelmingly established. Woodson told the investigating officer that "Jon" was the person who attacked him, immediately after the event identified defendant at an in-field show-up as the person who tried to shoot him, and identified the gun found on the canal bank as the gun used in the incident. Woodson told Ramsey that it was his girlfriend's daughter's (Well's daughter Kimberly's) husband (defendant) who tried to shoot him.FN2 Woodson had a reason to fabricate at trial since his girlfriend's daughter was the mother of defendant's child. Defendant was found near the scene of the crime immediately after the crime. The shotgun was found near where defendant was detained. A disinterested eyewitness identified defendant from his clothing, height, weight, and haircut as the man seen coming out of the motel room. Although Wells did not identify defendant at trial, she did identify defendant as the assailant in an earlier interview. Martinez testified that it seemed as if Wells knew the person who entered the motel room. In his statement to police, defendant placed himself at the motel with Woodson, claiming that Woodson took a swing at him. All of the above evidence is overwhelming in establishing defendant's guilt. "In general, when the evidence of guilt is overwhelming, the risk that exposure to extraneous information will prejudicially influence a juror is minimized." (*People v. Tafoya, supra,* 42 Cal.4th at p. 192.)

FN2. Although Kimberly and defendant were not married, they frequently were referred to as husband and wife.

The jury misconduct here was not prejudicial to defendant. Because defendant's constitutional claims are based on precisely the same argument which we have just rejected, these claims also fail.

In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial  . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  The Court is mindful of the fact that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Rushen v. Spain, 464 U.S. 114, 118 (1983), quoting Smith v. Phillips, 455 U.S. 209, 217 (1982).

Prejudicial extraneous influences on a jury constitutes misconduct and may result in reversal of a conviction.  Parker v. Gladden, 385 U.S. 363, 364-365 (1966).  However, "[o]n collateral review, trial errors-such as extraneous information that was considered by the jury-are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict."  Estrada v. Scribner, 512 F.3d 1227, 1235 (9th Cir. 2008) (citing Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir. 1997) (citing Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

Petitioner fails to demonstrate that due process required the state court to do anything more than it did in this case.  After Petitioner filed a motion for new trial, the trial court held a hearing to develop and resolve his claim of the alleged misconduct by Juror No. 10.  The trial court heard testimony from several witnesses, including Juror No. 10 and listened to argument by counsel.  The appellate court's finding that Petitioner's due process rights were not violated was not an unreasonable determination of clearly established Supreme Court law, nor was it an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d).  The trial court did not find Mr. Jackson to be credible and believed he was motivated strictly by attempting to purchase drugs from Timothy Harris.  The trial court further found that Juror No. 10 and Timothy Harris were truthful in their statements regarding the information that Jackson relied to them.  Under AEDPA, the trial court's credibility determinations are entitled to deference.  The Supreme Court has observed that this Court has "no license to redetermine credibility of witnesses whose demeanor has been observed by the trial court, but not by them."

1   Marshall v. Lonberger, 459 U.S. 422, 434 (1983); see also Burks v. Borg, 27 F.3d 1424, 1432

2   (9th Cir. 1994) (Circuit Court had no basis for overturning the presumptively correct finding by

3   the trial court that the juror was not prejudiced by extrinsic evidence).  In this instance, Petitioner

4   has not rebutted the presumption that Juror No. 10 was credible and Mr. Johnson was not.  There

5   is no evidence that Juror No. 10 mentioned the fact that Johnson told her he believed Petitioner's

6   father was a member of the Hell's Angels to any other jurors.  Nor is there any prejudice by the

7   fact that Jackson told Juror No. 10 that he believed Petitioner was not guilty as there was no

8   evidence that he was attempting to influence or usurp her function as an impartial juror.

9   Moreover, the evidence of Petitioner's guilt was overwhelming.  Petitioner was identified by two

10  independent witnesses as the individual who shoot at Woodson, one during an in-field show-up

11  and the other by his clothing, height, weight and haircut.  Petitioner was discovered near the

12  scene of the crime just after the incident, and the shotgun was found nearby.  Based on these

13  circumstances, there is no showing that the information relied to Juror No. 10 by Johnson had a

14  "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S.

15  at 637.  Thus, the instant petition for writ of habeas corpus should be denied.

16                                          RECOMMENDATION

17          Based on the foregoing, it is HEREBY RECOMMENDED that:

18          1.      The instant petition for writ of habeas corpus be DENIED; and

19          2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

20          This Findings and Recommendation is submitted to the assigned United States District

21  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

22  Local Rules of Practice for the United States District Court, Eastern District of California.

23  Within thirty (30) days after being served with a copy, any party may file written objections with

24  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

25  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

26  and filed within fourteen (14) days after service of the objections.  The Court will then review the

27  Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

28

1    failure to file objections within the specified time may waive the right to appeal the District

2    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3        IT IS SO ORDERED.

4    **Dated:**    **October 20, 2010**              _____/s/ **Dennis L. Beck**_____
                                                    UNITED STATES MAGISTRATE JUDGE

13